IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

      v.                                            22-CR-00184-V

DANIEL WARMUS,

            Defendants.

## GOVERNMENT'S REPLY IN SUPPORT
## OF MODIFICATION OF TERMS OF SUPERVISION

A request for modification of the conditions or terms of supervision was filed by United States Probation on February 6, 2023. Dkt. 2. On March 3, 2023, the United States of America filed a brief in support of U.S. Probation's request for modification. Dkt. 10. The defendant, Daniel WARMUS ("WARMUS") filed a response to the government's submission on March 24, 2023. Dkt. 11. The United States of America, by and through Trini E. Ross, United States Attorney for the Western District of New York, Russell T. Ippolito, Jr., Assistant United States Attorney, of counsel, hereby files this reply.

## PRELIMINARY STATEMENT

On February 10, 2023, an Initial Appearance was conducted following the issuance of a Summons for a Modification Hearing as to Daniel WARMUS ("WARMUS"). Dkt. 3. United States Probation petitioned to modify the conditions of supervision to add the following provision:

> *The defendant is prohibited from recording videos in or around county, state, or federal buildings. Furthermore, the defendant shall not record or post videos of public employees to social media accounts.*

On March 3, 2023, the United States of America filed a brief in support of U.S. Probation's request for modification. Dkt. 10. It was the government's position that this Court has the authority to modify the terms and conditions of WARMUS' release, and the proposed modification does not offend the First Amendment.

On March 24, 2023, WARMUS filed a response to the government's submission. Dkt. 11. WARMUS framed the issues as "(1) whether the proposed condition of supervised release would be violative of the First Amendment to the United States Constitution, and (2) even if it would not violate that Amendment, whether the Court *should* impose said condition." *Id.* at 3. WARMUS maintains that the proposed condition violates the First Amendment, and that even if it does not, the special condition should not be imposed.

For the reasons cited below, and for the reasons cited in the government's prior submission, Dkt. 10, the proposed special condition should be imposed.

I. **FACTS**

WARMUS used the "FACTS" section of his response to allege the government made "several factual assertions that [we]re inaccurate" that needed to be "corrected." Dkt. 11 at 3.

First, WARMUS argued that the "Government mischaracterize[d] the nature of Warmus' work, stating that he has 'manufactured disturbances' by conducting 'so-called government audits.'" *Id.* at 4. WARMUS was particularly displeased with the government's assertion that WARMUS earns money "by posting sensational videos on

YouTube in order to obtain views. The more sensational the video, the more views are generated. The more views generated by WARMUS the more ad revenue WARMUS makes for himself." Dkt. 10 at 6.

WARMUS responded to the government's assertion by arguing that there are "good" auditors and "bad" auditors, and that WARMUS is a good auditor because he posts both positive and negative interactions with government employees. WARMUS cited to several videos posted on his website that he described as examples of his positive review of specific government offices and employees. He insisted the positive videos were viewed thousands of times by his followers. According to WARMUS, one positive video entitled "I Respect Your Rights!" received 10,000 views from his followers; another positive video depicting the audit of Newfane, New York received 17,000 views; and a third video of a positive audit in Cattaraugus County received 18,000 views.

But WARMUS knows well that the positive audits are not what garner "views" and ad revenue. It cannot fairly be argued that WARMUS makes as much in ad revenue from positive audits as opposed to negative audits. One negative audit, entitled "I'll Call Security if you ask for a Photocopy," which is the WARMUS video that mocked and criticized the Erie County Attorney, received 114,000 views. More than twice the number of views of all three positive videos cited by WARMUS combined. Another negative video entitled, "Court Officers Get Educated on the Law," garnered 136,000 views, or three times the number of views garnered by all three positive videos combined. A recent review of the last fifty (50) videos WARMUS posted to YouTube indicated that just 4 or 5 were positive. *See*

https://www.youtube.com/@AuditingErieCounty716/videos (Last visited on 03/28/2023). Contrary to WARMUS' contentions then, and by his own definition, WARMUS is a "bad" auditor because ninety percent (90%) of his postings are negative. The claim that WARMUS "hopes for positive interactions," during his interactions with government employees as he indicated in his response, Dkt. 11 at 5, is belied by the facts. WARMUS makes money by creating conflict, and it is reasonable for this Court to prevent him from doing so.

Next, WARMUS uses the "FACTS" section of his response to justify the abuse he leveled at Erie County Attorney, Jeremy C. Toth. WARMUS claimed that he "entered [the Office of the Erie County Attorney] to file a FOIL request." Dkt. 11 at 6. That statement is, at best, only partially true. WARMUS entered the Erie County Attorney's Office to create a conflict, so he could post the conflict on YouTube and make ad revenue. The FOIL request was just an excuse for WARMUS to enter the Office of the Erie County Attorney. WARMUS had to have known that he could simply file a FOIL online. However, he had to be present in person to create a disturbance. WARMUS could have alternatively prepared a FOIL request in writing in advance of his appearance at the County Attorney's Office. But WARMUS wanted government employees to deny him a form, or paper, or a pen, or a photocopy. He did this so he could feign outrage and generate views on his YouTube Channel. WARMUS knew that the denial of any of those simple items would "trigger" his followers and generate views. Had WARMUS really wanted a copy of the FOIL request that he submitted at the Erie County Attorney's Office, he could have simply pointed his camera down to record what he submitted. But WARMUS was looking for ad revenue, not a photocopy of his FOIL request.

WARMUS also used the "FACTS" section of his response to argue that he cannot be held responsible for the conduct of others. WARMUS explained that he included a disclaimer in each of the videos that he is not responsible for threats made by others. However, the disclaimer that WARMUS attached to each of his videos is evidence that WARMUS knew his followers would engage in unlawful behavior as soon as he posted a negative video. The disclaimer is nothing more than an attempt by WARMUS to shield himself from civil or criminal liability for conduct that he expected to result.

WARMUS created conflict to generate ad revenue. His videos incite outrage in his followers, as evidenced by their conduct anytime a video is posted. In the videos, WARMUS deliberately talks to the camera to offer his followers running commentary on what he perceives and characterizes as outrageous government conduct. In addition to the running commentary, WARMUS also superimposes printed commentary over the video footage. As an example, the video entitled, "I'll Call Security if you ask for a Photocopy," which again is the WARMUS video that mocked and criticized the Erie County Attorney, and which received 114,000 views, contained superimposed commentary over the video footage. Some of the superimposed commentary included:

"I'll call security if you ask for a copy"

"Mark C. Poloncarz, County Executive
They serve themselves NOT the Public"
"What are they trying to figure out"

"This is it Fam She told me to wait
While they 'Figure it out'

In other words Wait for Security!"

"If I go in here the EGO will continue"

"They want the Erie County Family
To leave and get your own copy!"

"This is what EGO looks like Fam!"

"They won't photocopy a paper cause
He just don't want anyone to tell
Them anything or have any accountability"

"They love giving orders"

"This is what they have to do to appease
The County Attorney's EGO!"

"Order Followers"

"There is A LOT of Ignorance to film HERE!"

"This is like the walk of shame …
It's the talk of shame . .
Leave him Alone!"

"Total Tyrannical Jerk"

"Seems fitting 'a BAD LIER . . .""

"Erie County Fam they are STILL Trying to remove our
FIRST AMENDMENT RIGHTS
From this building!"

*See* https://www.youtube.com/@AuditingErieCounty716/videos - "I'll Call Security if you ask for a photocopy."

With this printed commentary superimposed over the video footage, and with WARMUS' running commentary to the camera, WARMUS attempted to generate outrage in his followers, because he knew it would result in more "views" and more ad revenue. His attempt was successful as the Erie County Attorney's Office received numerous vulgar and obnoxious emails and phone messages. The Erie County Attorney indicated that his office

was "inundated with phone calls from around the world . . . For the first few days, there were so many calls that we were not able to conduct business by phone . . . Many of those calling left messages, some were threatening, most were just crude and obnoxious."   Dkt. 10-1 at 4.

## ARGUMENT

### a. The Special Condition Will Further the Defendant's Rehabilitation

WARMUS' primary argument that the proposed special condition will detract from his rehabilitation efforts is that the special condition will prevent him from supplementing his income.  WARMUS makes part of his income by videotaping conflict he creates with government employees by posting videos of the confrontations on YouTube.  "While this is not petitioner's main reason for auditing, this monetized YouTube channel, along with his auto repair business, does allow him to remain self-sufficient.  *Id.*  There is little question that the more sensational the conflict, the more "views" WARMUS obtains on YouTube and the more money he makes.

The proposed restriction would prevent WARMUS from videotaping confrontations he creates.  Preventing WARMUS from videotaping and posting videos of government employees is the least restrictive way to prevent WARMUS from creating conflict.  The restriction would not prevent WARMUS from appearing at government offices, it would simply prevent him from profiting from the conflict.  He could still conduct "audits" and report on the audits to his followers on YouTube.  WARMUS could still exercise his First Amendment rights, he just would not be able to do so in the manner that he prefers.  The

same manner that inspires others to make vulgar, obnoxious and sometimes threatening calls to government employees.

WARMUS insists that "[t]aking away a legitimate source of income from a probationer does nothing to advance the goal of rehabilitation; rather it thwarts that goal." Dkt. 11 at 11.  However, the law is clear that restricting a defendant's employment in a specific occupation is proper and permissible.  The Comprehensive Crime Control Act authorizes the imposition of occupational restrictions as a condition of probation, 18 U.S.C. § 3563(b).  Section 3563(b) states in pertinent part that the Court:

> may provide, as further conditions of a sentence of probation, to the extent that such conditions are reasonably related to the factors set forth in section 3553(a)(1) and (a)(2) and to the extent that such conditions involve only such deprivations of liberty or property as are reasonably necessary for the purposes indicated in section 3553(a)(2), that the defendant-
>
> (5) refrain, in the case of an individual, from engaging in a specified occupation, business, or profession bearing a reasonably direct relationship to the conduct constituting the offense, or engage in such a specified occupation, business, or profession only to a stated degree or under stated circumstances.

18 U.S.C. § 3563(b).

Section 5F1.5 provides further guidance on the imposition of occupational restrictions as a special condition of probation:

> (a)    The court may impose a condition of probation or supervised release prohibiting the defendant from engaging in a specified occupation, business, or profession, or limiting the terms on which the defendant may do so, only if it determines that:
>> (1) A reasonably direct relationship existed between the defendant's occupation, business or profession and the conduct relevant to the offense of conviction; and
>>
>> (2) Imposition of such a restriction is reasonably necessary to protect the public because there is reason to believe that, absent such restriction, the

8

>     defendant will continue to engage in unlawful conduct similar to that for
>     which the defendant was convicted.
>
> (b)     If the court decides to impose a condition of probation or supervised
> release restricting a defendant's engagement in a specified occupation,
> business, or profession, the court shall impose the condition for the minimum
> time and to the minimum extent necessary to protect the public.

U.S.S.G. § 5F1.5.

The same type of conduct that led to WARMUS' conviction is the same type of conduct that WARMUS seeks to monetize. WARMUS wants to make money by disrupting government businesses and then videotaping the disruption that results. The disruption of our government was at the heart of what happened on January 6th. The goal of insurrectionists like WARMUS was to prevent Congress from certifying the election results of the 2020 Presidential Election, or at least to delay the certification. The insurrectionists were partially successful. The certification process was disrupted for hours by those who entered the Capital.

WARMUS continues to attempt to disrupt government operations by engaging in what he calls, "audits." A direct relationship exists between WARMUS' money-making racket of posting manufactured disturbances to YouTube and his conduct on January 6th. In both instances, important government business was disrupted. It is reasonable and rational to prevent WARMUS from engaging in such conduct to encourage his rehabilitation and to protect the public.

In *United States v. Hurtado*, 756 Fed. Appx. 63*; 2018 U.S. App. LEXIS 32911** (2d Cir. 2018), the Second Circuit was asked to consider the reasonableness of an employment

restriction imposed as a special condition of supervised release. The Second Circuit, citing *United States v. Tolla*, 781 F.2d 29, 34 (2d Cir. 1986), held that "it was neither unreasonable nor an abuse of discretion for the court to determine that a total ban on employment in specific types of businesses was necessary 'to protect[] the public [and] to rehabilitat[e] the defendant.'" *United States v. Hurtado*, 756 Fed. Appx. at 70.

## CONCLUSION

For the foregoing reasons, the government respectfully submits the proposed condition does not violate the First Amendment and the modification should be imposed.

DATED: Buffalo, New York, March 31, 2023.

TRINI E. ROSS
United States Attorney

BY: ***s/ RUSSELL T. IPPOLITO, JR.***
Assistant United States Attorney
United States Attorney's Office
Western District of New York
138 Delaware Avenue
Buffalo, New York 14202
(716) 843-5843
Russell.Ippolito@usdoj.gov